## JONES et al. v. JONES et al.

A deed absolute in form will not be deemed a mortgage, unless it is shown that a debt existed at the time of the transaction.

Evidence examined, and **held** to warrant a finding that a deed absolute in form was an absolute conveyance and not a mortgage.

Where an owner executed a conveyance for the purpose of preventing another from collecting a judgment that might be recovered in an action pending, neither he nor his heirs could obtain relief in equity.

A warranty deed with full covenants and conveying to the grantee a title in fee, without power of revocation or anything to indicate that the grantor intended to reserve an interest or postpone the vesting of title until his death, and not executed in conformity with Rev. Civ. Code, §§ 1006-1011, relating to the execution of wills, is not a will either under the statute or in the absence of statute.

(Opinion filed, June 13, 1906.)

Appeal from Circuit Court, Minnehaha County. Hon. J. W. JONES, Judge.

Action by Louis W. Jones and another against Isaac S. Jones and others. From a judgment for defendants, plaintiffs appeal. Affirmed.

*Joe Kirby* and *Davis, Lyon & Gates,* for appellants. *Boyce & Warren* and *Rogde & Winans,* for respondents.

FULLER, P. J. Claiming ownership by inheritance plaintiffs, the son and daughter and only surviving heirs at law of Wilson S. Jones, deceased, instituted this action to set aside a warranty deed under which the defendant Isaac S. Jones asserts fee-simple title to a valuable farm of about 240 acres, situated in Minnehaha county, of which it is alleged in the complaint their father died seised on the 3d day of October, 1902. For several years before his demise, Wilson S. Jones had been estranged and separated from his wife and children, and both himself and his bachelor brother, the defendant Isaac S. Jones, were elderly men at the time of the various transactions essential to this case. It was sufficiently shown by competent evidence and the court found that Wilson conveyed to Isaac by separate instruments the premises in dispute and other valuable lands in the vicinity of Sioux Falls, on the 14th day of December, 1897, and that the deed to this farm was apparently lost without ever having been recorded. Immediately thereafter, Isaac executed an instrument constituting Wilson his attorney in fact with as full power to manage, lease, and sell such property or any part thereof as an absolute owner might possess. As this power of attorney was not of record in February following, Wilson mortgaged the premises now in controversy in his own name to secure a loan of $3,500, the payment of which Isaac assumed in a later warranty deed executed by Wilson on the 8th day of May, 1900, and duly recorded in the office of the register of deeds. However, this $3,500 mortgage on what is called the "home farm" was fully paid and satisfied of record by Wilson on the 7th day of October, 1901, from the proceeds of the sale of other lands which he had previously deeded to Isaac. From the proceeds of similar sales and rents and profits of the lands he paid various other debts which

he had contracted from time to time, so that on December 8, 1901, he wrote Isaac in part as follows: "I have paid off every debt that. I owe in Dakota, including mortgage on 'home place.' Then I advertised in three of our papers to bring in all accounts and get their money, and I don't think I owe any human being five cents, and I have got past being afraid of blackmailers."

The last suggestion undoubtedly relates to an action for damages with which Wilson was threatened by one Eliza J. Titus in 1897 when the first deeds were executed, and which was actually pending in the circuit court at the time of the execution of the deed of May·9, 1900, concerning which deeds the trial court found: "That the purpose of the said Wilson S. Jones in making said deeds to the said Isaac S. Jones was to bestow the said property upon the· said Isaac and perfect the title in him in his lifetime, and to prevent the said plaintiffs and the said Eliza J. Titus from obtaining any share or interest therein, either in the lifetime of the said Wilson or after his death." The record shows that in the year 1894 Wil-·son and Isaac exchanged wills, by which each devised. and bequeathed to the other all the property then owned or of which he· might die seised, and thereafter and at about the time Wilson deeded his property to Isaac, the latter executed another will of similar import, which was delivered to and retained by Wilson during the remainder of his life. While Wilson kept Isaac fully advised as to every transaction pertaining to the property, he retained entire management of affairs, including the making of improvements, sale and leasing of lands, collection of rents, and disbursement of funds, and his letters reporting the various transactions to Isaac, who resided in the state of Washington, disclose a firmly fixed determination to vest in him all his property, both real and personal, to the exclusion of his wife, son, and daughter. To avoid the necessity of recording his power of attorney, Wilson would send deeds to Isaac for execution and ask his advice concerning the disposition to be made of the money for which the land sold, and in his letters, some of which contained remittances, he spoke of the· grain grown upon the different farms as belonging to Isaac. Occasionally during the last year or two of his life Wilson was absent from Sioux Falls for the benefit of his health, and wrote Isaac

frequently concerning his greatly impaired physical condition and the disposition he had made of his property. On November 14, 1901, he wrote, in part, as follows: "Dear Brother Isaac S. Jones: * * * I will start next Monday for the tar country of North Caro- lina. If I get better there, will stay until spring. If not, will go to Porto Rico. If alive in the spring, will return here. I have made arrangements with C. A. Vincent. In case he hears of my death before you can get here, he is to empty the bank vault and draw the bank dry before any enemies get there, and turn everything over to you. Then you will be in shape to·laugh at our enemies." Again on December 8, 1901; "Now you speak of my doing bus- iness in your name. Everything has been done in your name except. the last two sales in McCook county: The one for $8,300. This was all paid for. The other for $3,200; one-half paid, the other one-half on 5 years' time, 6 per cent. Can get face at any time. I can't see where there can come any trouble until after my death, and the only thing we have to fear then is the old woman and her offspring, and I have given that more thought for the last year than all others. I went to the bank before I came away and tried to fix it with the bank so that you could draw out all the de- posits as soon as it was known I was dead, and at the same time check on the bank for what money I might want before, and the bank- er said he could not do that. He could not make the amount in two names subject to check so I left the account in my name and made arrangements with C. A. Vincent, and gave him one of my bank vault keys, so that in case of you not getting there before the enemies that he could take everything out of the vault before any injunc- tion could be served on the bank. I also made arrangements with Vincent, in case of emergency, to send him a check to draw de- posits out of bank in case you do not get there in time. I had to trust some one there, and I don't know of any one there that I would sooner trust than him, for he thinks too much of you and me to betray our confidence. If he does, shoot him. I will leave here some time this week for Jacksonville, Fla. Your letter will reach me there. Don't know how long I will be there. Expect to go to Porto Rico. My cough is some better. Heart trouble about the same. I have done the best I could in everything that I know

how to do, and I don't think you could have done better if you had been here."

In a letter dated March 5, 1902, he refers to the matter thus: "Dear Brother Isaac S. Jones: I have just received your letter in answer to mine. I also received one from Vincent. He says everything is all right there. I have got everything there fixed so that in one-half hour so that the devil can't get hold of one dollar, and in case I should die before I get home if you obey my dispatch, as soon as I am dead you will have time to get there and get everything in your hands before the first enemy can get there, then if you don't hold it I won't be to blame." It is thus shown by his frequent utterances and a uniform course of conduct that Wilson was intensely adverse to his wife and children having any of his property during his lifetime or after his death, and in order to carry out that intention he sought to perfect title in Isaac, so that, as he stated in one of his letters, "there will be no wills to break by false swearing." It is clear that the relation existing between the brothers had always been most amicable until shortly before the death of Wilson, when, after an unsuccessful effort to procure a reconveyance of the property remaining unsold, Wilson instituted an action against Isaac to cancel and set aside the deeds on the ground of fraud and want of consideration.

In support of the claim that the conveyance must be deemed a mortgage, because made to secure the payment of a loan, plaintiff's introduced testimony showing that Isaac sent Wilson $800 in 1897 and $1,600 more in August, 1900, some three months after the second deed was recorded, and that in September, 1901, Wilson sold one of the other farms previously deeded to Isaac and transmitted $2,600 of the purchase price in a letter as follows: "Dear Brother Isaac: * * * Have sold the Salem farm. Got $8,300 for it. The first time I went to McCook county I forgot to take the deeds, and the next time got the wrong papers. The two deeds were not on record, so I deeded direct, saving some expense. I will send you three drafts, in all $2,600, to apply on our deal. I don't know how much the interest will be. Have forgot the time. All I remember I sent you $100 to apply on interest. I wish you would make up a statement. I have got money enough to pay the home mortgage,

$3,710, interest and all, and I have somewhere near $2,000 in bank besides, so there will be no worry about paying debts. I will write to Chicago today and see if they will take the money on home mortgage and discount the bal. of interest. If so, I will send them the money. Yours with best wishes. [Signed] W. S. Jones." It was further shown that some time during the month of March, 1900, R. W. Parliman, an attorney at law, went out to the farm in question at the suggestion of Wilson, and, in the presence of Isaac, drew two deeds for the purpose of conveying such premises and another farm from Isaac back to Wilson, but these deeds were never executed.

Concerning what occurred at the time Mr. Parliman testified in part as follows: "The first thing talked about was Wilson S. had an action here in court, where some woman had sued him for damages and obtained a judgment against him for, I believe, $1,500. He wanted to know what effect that would have on his property interests if his property was deeded back to him by Isaac S. Jones. I advised him that he would have to pay; that he could not cover up his property. He then asked me if his will was all right, and said that his divorced wife had taken the position that he was crazy, and whether, if Isaac deeded the property back to him, they could break the will and get the property. I went on and drafted the deeds as he told me to, and after they were drafted, in the presence of Isaac Jones and Wilson Jones, I read what I had drawn. In one or two instances there were some changes made. I don't remember what they were. The descriptions, as I remember it, I took from some deeds that were executed, I believe, in 1897. I got up from the table. I says, 'They are ready for the signatures', and held the pen toward Isaac Jones. Wilson Jones says: 'Well, I don't know. I don't believe I'll have you execute these deeds. I borrowed money of you, and am owing you for money anyway, and we will let this thing stand as security for your debt.' He asked me if that would be good. I said, 'Yes, if it is in good faith.' Q. What did Isaac say to that? A. 'All right.' In fact, Isaac said, 'Fix the thing up anyway to suit yourself, and it will suit me.' Q. Did Isaac at this time make any claim or statement or suggestion contrary to what was said by Wilson, or did he make any claim

to the property as his property? A. No. Q. Have you stated, in substance, all that took place there that day? A. No, I don't think I have; I think it would take a long while. I was there all day long and we talked all the time. I know it was talked back and forward between W. S. Jones and Isaac S. Jones that it would not make any difference how the deeds ran; that there was a will made there by W. S. Jones in which Isaac was named as the beneficiary, and that irrespective of what was done at that time or prior thereto, that that will itself would convey the property to Isaac Jones ultimately. That was discussed. When I say 'property,' I mean this home place."

In the light of all the circumstances, including what was said and done before, as well as at and after, the time of the above conversation, it is quite apparent that the deeds were not executed with the intention to have them operate as mortgages, nor was the title retained in Isaac to secure a debt. Never before or afterward was anything of the character suggested, and it seems quite clear that neither party intended, when the deed in controversy was executed, that the same should operate as a mortgagee. The inference of a secured claim is also excluded by Wilson's latest will and testament, which was adjudged void, and which was executed after he had become hostile to his brother, and which contains the self-serving recital that his property was put in the name of Isaac S. Jones for convenience and is held in trust for the testator. So in the complaint in this action to set aside the deed it is alleged that the same was procured by fraud, and that the title is held in trust for Wilson; but there is no intimation of a mortgage. No promissory note or other evidence of indebtedness was ever given, nor was it shown that Isaac advanced the $800 to Wilson concurrently with the execution and delivery of the deeds in 1897, or that there was any debt to be secured at that time. While contemporaneous conduct and declarations may doubtless be shown to prove that an absolute deed was intentionally executed, delivered, and accepted as a mortgage, a debt or some other obligation to be secured must exist at the time of the transaction, and nothing less than clear, certain, and conclusive evidence will justify such a conclusion. Perot v. Cooper, Adm'x, 17 Colo. 80, 28 Pac. 391; Crane v. Chandler,

190 Ill. 584, 60 N. E. 826; Ingram v. Illges, 13 South. 548; Book v. Beasly, 138 Mo. 455, 40 S. W. 101; Kellog v. Nothrup, 115 Mich. 327, 73 N. W. 230; Henley v. Hotaling, 41 Cal. 22.

The pecuniary condition of Wilson, the contingency, real or imaginary, with which he was confronted, and the letters showing the affectionate relation existing between the brothers when the deeds were executed and until shortly before Wilson's demise, are circumstances which repel every inference of a mortgage, and confirm the presumption attached to the deeds themselves. The trial court was therefore fully justified in finding that the deed to the premises in controversy executed and delivered on the 9th day of May, 1900, was an absolute conveyance, and was not intended as security for a debt or the performance of any other act. No testimony was offered in support of the allegations of mental incapacity on the part of the grantor or that the grantee resorted to fraud and undue influence in obtaining the deeds which the evidence shows were duly executed and delivered. That it was a free will act on the part of Wilson, prompted by a self-conceived determination to place his property beyond the reach of his wife and children and Eliza J. Titus, by vesting absolute title in Isaac, is a controlling proposition that stands proved. Were it to be assumed that the conveyances were made solely to prevent the Titus woman from collecting the amount of any judgment that might be recovered in her favor against Wilson in the action then pending, he would not be entitled to relief from such fraudulent conduct, nor would a court of equity interfere on behalf of his heirs who, claiming under him, could take what he had but nothing more. McClintock v. Loisseau ,8 S. E. 612, 2 L. R. A. 816; Hildebrand v. Willig, 64 N. J. Eq. 249, 53 Atl. 1035; McElroy v. Hiner, 133 Ill. 156, 24 N. E. 435; Pride v. Andrew, 38 N. E. 84; Foules v. Foules, 33 South. 972.

The contention that the deed in controversy is testamentary in character is clearly without merit, for the reason that it passed the present interest and was not made in conformity with the statute prescribing the essentials of a will, and expressly declaring that no will is valid unless so executed. Rev. Civ. Code, §§ 1006-1011, inclusive. No claim is made that this instrument contains the

power of revocation or anything to indicate that Wilson intended to reserve an interest or postpone the vesting of title until his death, but confessedly it is a warranty deed containing full covenants and conveying to Isaac title in fee simple. The proposition that such instruments can never be testamentary in character, even in the absence of statutes like ours, is sustained by all accessible decisions, among which are the following: Bogan v. Swearingen, 199 Ill. 454, 65 N. E. 426; Christ v. Kuehne, 172 Mo. 118, 72 S. W. 537; Durand v. Higgins, 67 Kan. 110, 72 Pac. 567; Adair v. Craig, 135 Ala. 332, 33 South. 902; Brice v. Sheffield, 118 Ga. 128, 44 S. E. 843; St. Clair v. Marquell, 161 Ind. 56, 67 N. E. 693; Phillips v. Phillips, 30 Colo. 516, 71 Pac. 363.

All that is presented in the able briefs of counsel for appellants, including their assignments of error relating to the rulings of the trial court on questions of evidence, has received studious consideration; but we find nothing to justify a reversal, and the judgment appealed from is affirmed.