MATTIE F. NEEDLES et al., Appellees, v. SHENANDOAH NATIONAL BANK, Appellee; GUY W. DRAKE et al., Appellants.

**GIFTS: Inter Vivos—Right of Revocation.** A writing which on its face carries a presumption of a consummated gift of the property which accompanies the writing does not foreclose the apparent donor from establishing in his lifetime that such was not his intention; that, in the execution of the writing, he did not intend to surrender. either his dominion over the property or his right to revoke the writing.

Headnote 1:   28 C. J. pp. 673, 674.

Headnote 1:   12 R. C. L. 952.

*Appeal from Page District Court.*—EARL PETERS, Judge.

DECEMBER 14, 1926.

Suit in equity, to enjoin the attempted revocation of an alleged gift of certain promissory notes. The plaintiffs are the alleged donees, and the daughters of the defendant Eliza Drake, the alleged donor. The defendant Guy Drake is the brother of the plaintiffs. The defendant Shenandoah National Bank is the custodian of the notes. The defendant Eliza Drake denied the gift, and denied that she ever intentionally made such gift *in præsenti* or ever intended a delivery thereof *in præsenti.* Certain affirmative averments are also made. The district court entered decree finding that the gift was consummated, and permanently enjoining attempted revocation thereof. From this decree the defendants have appealed.—*Reversed.*

*Wilson & Keenan* and *Tinley, Mitchell, Ross & Mitchell,* for appellants.

*Mattox & Clovis,* for appellees.

EVANS, J.—The controversy in its ultimate motive is one between the children of a generous mother, over their prospective interests in her estate. As is usual in such cases, the parent is torn by the fangs of the filial controversy. The controversy turns upon a certain transaction had on February 7, 1924, an understanding of which requires a brief statement of the preceding family chronology.

Up to 1910, the Drake family lived in Page County, Iowa. The family consisted of husband and wife and three children, all of whom are now parties to this litigation except the husband, who died in 1919. In 1910, Mr. and Mrs. Drake and their daughter Mrs. Needles and her husband moved to California. The son Guy remained in Iowa. The daughter Mrs. Bostrom also continued to reside in Iowa for a time, and thereafter in Nebraska. Mr. and Mrs. Drake and Mr. and Mrs. Needles acquired in California adjoining homes, and occupied the same for ten years. In December, 1919, Mr. Drake died. Mrs. Drake was the owner of their 80-acre farm, located in Page County. In 1920, she and Mrs. Needles visited Page County, for the purpose of selling the farm. It was at a time of soaring land prices, and the farm was sold to the son Guy for $350 per acre, and for a total of $28,000. Of this purchase price he paid his mother $8,000, leaving a balance of $20,000. At the same time, the mother made a distribution of $15,000 of her estate by giving to her daughters $5,000 each, and giving to Guy a credit of $5,000 upon the purchase price of the farm. This left the mother holding $15,000 of Guy's notes, drawing 5½ per cent interest. In the ensuing years of hard times, Guy was not able to meet his interest payments. The family correspondence gives evidence of some cleavage between the children, as between the daughters, on the one hand, and Guy on the other. This appears to have been stimulated by the fact that Guy was not keeping up his interest, and by the further fact that he pleaded for more or less consideration for the fact, in the light of subsequent events, that he had paid an inequitable price for the farm. The record indicates an evident desire in the mind of Mrs. Needles to put up some barrier against a possible encroachment upon the estate by, or on behalf of, Guy through the sympathy of his

mother. Substantially all the remnant of the mother's estate consisted of Guy's notes and her home, worth about $7,500. Mrs. Needles was the principal and closest adviser of her mother in her business transactions. The mother, however, was a careful and intelligent person, of business judgment, and was manifestly a woman of high character. She left her notes at all times in the custody of the Shenandoah National Bank, with which bank she and her husband had transacted business for many years. She was worried over a possible double taxation of her notes, both in California and in Iowa, and likewise double inheritance taxes.

Ever since the death of her husband, she had had under contemplation some method of so disposing of her property as to make administration upon her estate unnecessary. As between her children, her purpose at all times was to maintain equality of distribution. She had corresponded with her attorney in Iowa as to a method of carrying out her purpose. This was in 1920. He advised her at considerable length, in substance that she could deliver her notes in her lifetime to a third person, to be delivered after her death to her children. He also advised her:

"You would have to renounce all claim to them however when deposited, except that you could reserve the interest."

This correspondence is the strongest circumstance in the record against her. She never indicated, however, her willingness to follow the plan thus suggested. She later conceived a plan of her own, which did not include affirmative renunciation of her dominion over her property during her life. Nothing, however, was actually done under either plan. On December 26, 1923, she was taken very ill, and was confined to her bed, and so continued until the month of March. She was at that time in her eighty-second year. The testimony of the plaintiffs shows that she was not expected to recover, and did not herself expect to recover from her illness. It was during this illness, and on February 7, 1924, that the transaction occurred which is involved in this suit. Previous to this date, the notes had been sent for, and had been received from the Shenandoah National Bank. Certain credit indorsements were made thereon on February 7th. The notes were thereupon returned to the Shenandoah National Bank, with the following letter of instructions:

"Los Angeles, Calif.,
"February 7, 1924.

"Shenandoah National Bank,

"Shenandoah, Iowa.

"Gentlemen:

"I hand you herewith the three notes signed by Guy Drake and secured by mortgage on his farm, which you have held heretofore to collect interest. On one note I have endorsed that it is to become the property of Guy Drake at my death; on another that it is to become the property of Mattie F. Needles at my death; and on the other that it is to become the property of Mertie E. Bostrom. Each is in the sum of $5,000.00, on which endorsements have been made reducing the total principal to $13,000.00, and the interest has been endorsed as you will notice thereon. You are to hold these notes until my death, collecting the interest and remitting the same to me as usual. At my death the one for Guy Drake is to be handed to him by you; the one for Mattie F. Needles is to be handed to her by you; and the one to Mertie E. Bostrom is to be handed to her by you. The mortgage securing the notes is to be handed to Mattie F. Needles and Mertie E. Bostrom, or either of them. An affidavit showing my decease, signed by either Mattie F. Needles or Mertie E. Bostrom, will be sufficient authority for you to deliver the notes and the mortgage.

"Very truly yours,
"Eliza A. Drake,
"1299 N. Cataline Ave.
"Pasadena, Calif."

For the purpose of this transaction, Mrs. Needles had called the California attorney with whom she and Mrs. Drake had usually counseled, and the letter of instruction was prepared by him and was signed by Mrs. Drake. It was mailed by Mrs. Needles. It will be noted that this letter of instruction was such as would have warranted the inference of a delivery *in præsenti*, and would have warranted the court in so construing it, in the absence of a challenge by her in her lifetime that such was not her intention. The cardinal requirements of a gift are: (1) That there must be an intention of the donor to make it *in*

*præsenti;* (2) that there must be *an intentional delivery *in* *præsenti.*

This case turns upon the question whether Mrs. Drake understood and believed that she was parting with her dominion over her property irrevocably, and therefore intended to so part with it; or whether she understood and believed, and so intended, that her right of dominion, and therefore her right of revoking her instruction, was to continue during her lifetime, and to become effective only upon her death. As bearing upon the general proposition of law involved herein, which is indeed quite elementary, a few excerpts from 28 Corpus Juris may properly be set forth:

"A clear and unmistakable intention on the part of the donor to make a gift of his property is an essential requisite of a gift *inter vivos*. And this intention must be inconsistent with any other theory. In this respect there is no distinction between verbal gifts and those evidenced by a writing, or between gifts of personalty and gifts of realty. Delivery of property without such intent, as, for instance, through inadvertence or mistake, will not support a gift. Moreover, the intention required is a present intention; a mere intention to give in the future, however well shown, gives rise to no obligation which the law will recognize or enforce. It is not necessary, however, that the expression of intention be synchronous with delivery. There is no particular form in which the intention of the donor must be expressed. It may be manifested by acts or words or both, or it may be inferred from the relation of the parties and from all the facts and circumstances." Pages 627-8.

" * * * Where a donor uses clear and unambiguous language showing a clear intent to make a gift and a belief on his part that he has done all that is necessary to complete it, the act of delivery, if slight and ambiguous, will be aided thereby, particularly in case of a gift from a husband to a wife." Page 634.

"Where the donor has been induced through a mistake of fact, or misrepresentations, to make a gift, equity will intervene to set the same aside. * * * One desiring to rescind a gift made under mistake as to his legal right to the property is bound to act promptly upon learning of such mistake." Page 652.

"Constructive fraud often exists where the parties to the gift have a special confidential or fiduciary relation, which

affords the power and means to one to take advantage of, or exercise undue influence over, the other. Wherever, from such relation, considerable authority or influence necessarily exists on the one side, and a corresponding reliance and confidence is placed on the other, a party will not be suffered to abuse this authority or influence by extracting any advantage to himself, and a gift obtained under such circumstances will be avoided, in equity, unless it appears that it was made without fraud or undue influence. Ordinarily, a gift by a person old and feeble and easily influenced, to one in attendance upon him, will be viewed with suspicion. But such gifts are not necessarily void, and in some cases would be perfectly natural and proper, and they will be upheld where it appears that they were made freely and voluntarily, without the exercise of any undue influence. The mere existence of a confidential relationship does not, as a matter of law, operate to bar the right of a beneficiary to receive a gift. If the donor was, at the time, of sound mind, and clearly understood the transaction, and exercised a free will in the act, being under no restraint or undue influence, such gift will be supported. But the law views transactions of this kind between such parties with some jealousy, and to set them aside it is not necessary to aver or prove actual fraud, or that there was such a degree of infirmity or imbecility of mind in the donor as amounts to legal incapacity to make a will or execute a valid deed or contract. If, at the time of the gift, the donor's mind was enfeebled by age and disease, even though not to the extent of producing mental unsoundness, and the donor acted without independent and disinterested advice, and such gift was of a large portion or all of the donor's estate, and operated substantially to deprive those having a natural claim to the donor's bounty of all benefit from the donor's estate, these circumstances, if proved and unexplained, will authorize a finding that the gift is void, through undue influence, without proof of specific acts and conduct of the donee. Although the donor may be well aware of what he is doing, yet, if his disposition to do it is produced by undue influence, the transaction will be set aside. But where the nature of the confidential relation existing between the parties is not such as to raise a strong presumption of undue influence, it seems that the gift may be supported simply upon proof that the donor understood the transaction." Pages 653-4.

"In some jurisdictions, where a confidential relation exists between the donor and the donee, the validity of a gift depends upon whether or not the donor had independent advice. And, even where this rule is not recognized as controlling, it has been held that the question whether or not the donor received independent advice is a material one to be considered with other surrounding facts and circumstances, such as the nature and purpose of the gift and the condition and relation of the parties." Page 654.

"In the absence of evidence raising a suspicion of fraud or undue influence on the part of the donee, the fairness of a gift will be presumed, and the burden is on one attacking the validity of the gift on that ground to show clearly that it was not the voluntary act of the donor. However, the presumption of fraud will arise more readily in cases of gifts than in cases of contracts. And where the circumstances are such as to suggest fraud and undue influence, the burden is on the donee to overcome the presumption of fact arising therefrom. Thus, where the relations between the parties appear to be of such a character as to render it certain that they do not deal on terms of equality, but that either, on the one side, from superior knowledge of the matter derived from a fiduciary relation, or from overmastering influence, or, on the other, from mental weakness, or dependent confidential relation, unfair advantage in a transaction is rendered probable, then the burden is shifted, the transaction is presumed void, and it is incumbent on the stronger party to show affirmatively that no deception was practiced, no undue influence was used, and that all was fair, open, voluntary, and well understood. This is usually done by showing that the grantor had the benefit of competent and independent advice of some disinterested third party, and in some jurisdictions this is required to be shown. This presumption of undue influence is more or less strong, according to the nature of the relation which the parties occupy toward each other. The presumption against the validity of the gift is not limited to those instances where the relation of parent and child, guardian and ward, or husband and wife, exists, but in every instance where the relation between the donor and donee is one in which the latter has acquired a dominant position. The rule has even been applied

to a gift from a principal to his agent, but it is usually held otherwise.'' Pages 670-1.

''Since intent is a mental fact requisite to create a gift, the donor may testify directly as to his intent at the time of the transaction. So evidence as to an alleged donor's motives, reasons, or inducements in making the gift is admissible for the purpose of sustaining the probability that the gift was in fact made.'' Page 674.

''It is necessary to establish by the kind of evidence above stated [clear, convincing, and satisfactory] the competency of the donor, freedom of the will, intent, delivery, acceptance, and the parting by the owner with his control or right of dominion over the subject of the gift. An actual delivery may be proved from the facts and circumstances, and need not be proved by witnesses who saw it made; but the circumstances proved must clearly and satisfactorily show a delivery.'' Pages 678-9.

The general purport of the foregoing was recognized by us in *Runnels v. Anderson,* 186 Iowa 1370, at 1380, wherein we said:

''There must be not only intent and purpose to give, and by the gift to pass title to the donee, but there must be a delivery, in pursuance of that purpose and intent. Or, in other words, there must be proof of intent to make a present gift, with the present intent and purpose to pass title, followed by an actual delivery of the thing which is the subject-matter of the gift. The burden of proof is on the one who asserts the gift to prove all the essential elements to consummate the gift, and this evidence must be clear and satisfactory, and, as some of the cases say, 'conclusive.' *Truman v. Truman,* 79 Iowa 506; *Wilson v. Wilson,* 99 Iowa 688.''

In *Mulock v. Mulock,* 31 N. J. Eq. 594, it was said:

'' 'This court never can recognize any deed which is a mere voluntary deed of gift, when it appears that there was any defect in the understanding of the nature of the gift on the part of the donor; if the deed be tainted with a want of complete understanding of its nature by its author, the court must treat it as invalid, and consider that the property did not pass.' * * * The wisdom and justice of this principle are obvious to every mind. Its application to this case is conspicuously pertinent, and its effect most righteous.''

The foregoing excerpts from Corpus Juris are all sustained by abundant authority therein cited, and we shall give no further attention to the discussion of the law applicable to the record before us. Mrs. Drake was a witness in the case, and testified to the circumstances attending her signing of the writing. She testified definitely that she did not understand that she was parting *in præsenti* with the dominion or control of her property, but that she fully believed that she retained full control and power of revocation of her instruction during her lifetime. She signed the paper under circumstances of great disadvantage. She had no recollection of the presence of any person at the time of her signing. Mrs. Needles was present, and a granddaughter, Miss Bostrom, and the attorney. Mrs. Drake remembered none of them, but did remember that she signed the paper. It is not at all incredible that she should have had the understanding to which she testifies. The legal distinction and the importance thereof between a delivery *in præsenti* and a delivery in the future after the death of the donor are not readily apparent to the lay mind. It will be noted in the writing before us that it speaks wholly in the future tense, and that it contains no language calculated to direct the attention of a layman to the fact that its legal effect is immediate, and not in the future. She testified that under no circumstance would she have executed the instrument if she had believed that it terminated her control over her property during her life. A reading of this record convinces us that she truthfully discloses the real attitude of her mind at the time of the signing. Some of the convincing circumstances are that she was actually dependent upon the principal sum comprising her estate, for her support. She so testifies, and it is nowhere denied. It appears that, at or about the same time, she conveyed her homestead to the two daughters. This was valued at $7,500. The notes in question comprise substantially all the rest of her estate. Her only confidential adviser was Mrs. Needles, who was the beneficiary of the gift. The paper was executed *in extremis,* when she was very ill. She was never more dependent upon her daughter for assistance and advice than at that very time. In the distribution of her estate, she had previously given to Mrs. Needles $6,000. To this should be added one half the value of the home conveyed to the two daughters. She had previously given to Mrs. Bostrom $5,000, to which should

be added one half the value of the home. That the last remnant of her property should be taken from her, under color of a gift, in the hour of her helplessness by reason of illness, presents a situation which appeals to a court of equity in her favor, and would so appeal if a complete delivery had been made to the donees themselves. Mrs. Drake first learned on June 28th that the claim was made that her proposed gift was irrevocable, and that she had lost dominion over her property. The occasion for it was that, after her recovery, she had written to a friend in whom she had confidence, in Page County, asking that he advise her of the actual value of the farm purchased by Guy. The information given her was that it was worth not to exceed $250 an acre. Though she had heretofore resisted Guy's plea rather firmly, giving him some moderate credits, the information received by her convinced her conscience that she ought to reduce the price. This she determined to do. She wrote to Guy, asking him to come to California, in part, at least, at her expense. It was in her effort to make this amend to her son that it was revealed to her that she had lost her dominion. She wrote to the Shenandoah Bank for a return of the notes. The daughters checkmated her by wiring to the bank a warning forbidding its surrender of the paper. Hence the lawsuit.

It is true, in the consideration of the case, that the conception which Mrs. Drake had of the legal effect of her act was one which would reduce it to a nullity. This was doubtless the consideration that influenced the trial court. We do not deem it adequate as an estoppel against her. If she mistakenly supposed that she could dispose of her estate after her death in that way, and yet retain full dominion over it during her lifetime, it was a mistake on her part, and nothing more. It does not furnish a reason why she should be bound to something which she had not intended, and which she would not have consented to, if she had understood. The instrument actually signed by her has not in it any affirmative language which is inconsistent with her conception of its effect, even though it be true that it could properly be construed inconsistently with such conception.

The terms of this instrument are not necessarily controlling of the result. The controlling question is, What was the real intention of Mrs. Drake when she sent her notes to the Shenandoah Bank? Did she intend at that time to make a present gift

and to surrender her present ownership and dominion over her property? Did she at that time intend and believe that she was retaining dominion of the property during her lifetime? If yea, the gift was not consummated. The written instrument is very important evidence, as bearing on such question, and it is only that. It was not a contract, nor is it claimed to be enforcible as such. It is subject to explanation, and even to contradiction, like any other non-contractual writing. It does cast a burden of explanation upon her. Without such explanation, the instrument would be deemed to express her intention at that time. In such event, the only question presented would be one of construing the terms of the instrument. In the presence of the explanation made, and the contention put forward in the evidence of the mother as to what her real understanding was, the ultimate question is to be determined in the light of all the evidence, including both the writing, on the one hand, and the oral evidence, on the other.

As already foreshadowed herein, we see little reason to doubt the candor of Mrs. Drake, as a witness, on this question. There is nothing incredible about it; whereas, on the other hand, a present gift and surrender of her property would have been a very improvident act on her part. When it is further considered that the instrument was signed by her when she was under a large degree of disability, and that she acted under the advice and assistance of one of the donees, and that she thereby gave away substantially the last remnant of her property, her claim of misunderstanding is greatly corroborated and fortified. In such a case, though it were found that the gift had been consummated, even so, in the presence of the circumstances here indicated, a court of equity might well permit her to renounce even a consummated gift.

We hold that she did not intend at that time to surrender her dominion of the property, and that the gift was therefore not consummated. This conclusion results in the reversal of the decree below.—*Reversed.*

DE GRAFF, C. J., and ALBERT and MORLING, JJ., concur.