W. THEO WOODWARD, Appellant, v. CARRIE WOODWARD,
Appellee.

No. 43096.

JULY 31, 1936.

REHEARING DENIED NOVEMBER 27, 1936.

Rayburn & Crisman, and Swan, Martin & Martin, for
appellant.

Talbott & Talbott, and Boorman & Whitmore, for appellee.

ALBERT, J.—To a fair understanding of the questions in-
volved, a general statement of the background of the case should
be made.

The original family of W. J. Woodward consisted of his
wife and two sons, W. Theo (the plaintiff herein) and Adolph,
who died many years ago leaving heirs. The mother of the plain-
tiff died in 1920, and in 1921 the father married Carrie Con-
nolly, the defendant herein.

The plaintiff and his father had been engaged in the general
mercantile business and the conducting of a private bank at
Lewis, Iowa, for many years. These businesses were disposed of,
and in 1922 the plaintiff moved to Florida. The financial rela-

tion of Theo and his father seems to have been somewhat mixed, but after Theo moved to Florida there was some real estate acquired in that state by W. J., and numerous loans were made there in W. J.'s name, the business in Florida being conducted through the plaintiff who was an attorney at law. A large part of the evidence in this case consists of correspondence and telegrams which passed between Theo and his father.

In 1926 there was some correspondence between the father and son relative to the father's making a will,—and, incidentally, we have in the record a copy of what purports to be the last will and testament of W. J. Woodward. The substance of this instrument leaves $500 to a niece, and a life estate to the wife, Carrie, as long as she remains his widow, with a vested remainder in the plaintiff. This purported will bore date of the 5th of November, 1926. In December of the same year W. J. and his wife Carrie visited the plaintiff in Florida. At that time a writing was executed, signed by Theo and his stepmother, the substance of which was that the plaintiff herein agreed to lend his moral support toward, and use his best efforts for the making and keeping by his father of a last will and testament in which the father should give all his property in trust to the plaintiff for the sole use and benefit of Carrie during her natural life. In consideration therefor, and the sum of $10 in cash paid, Carrie agrees to take under the will of her husband "which shall provide that she receive during her lifetime the net income from her husband's estate, together with the use of the homestead for and during her natural life." To our minds, this writing has very little, if anything, to do with the questions involved.

Many deeds, mortgages, and notes passed back and forth between W. J. and his son during all this time. In the middle of the year 1932, correspondence passed between W. J., Carrie, and Theo relative to a settlement of the father's estate prior to the time of his death. There seems to have been a tentative agreement that the property should be divided by the plaintiff (Theo) getting all the property and mortgages in Florida, and the wife getting all the assets in Iowa. Numerous letters were written by the father, the son, and Carrie, looking to such a settlement; and it is on this alleged settlement that the plaintiff bases his rights herein.

The plaintiff also claims certain personal property by reason of a gift. His claim is that on a certain visit to his home by the

deceased and Carrie all the mortgages and notes on the Florida property were delivered by the father to the son. The evidence shows that on this visit the father had with him a bundle of papers and that he was taken sick and handed this bunch of papers to the son with the instruction to take care of them. No one seems to be able to identify definitely the contents of this bundle of papers. When the father and his wife left for home after this visit, Carrie took this bundle of papers with her, and the evidence as to the contents of this bunch of papers is too hazy, indefinite, and uncertain to form the basis of a conclusion as to what it contained.

■■■ The doctrine of gift is so well settled and fundamental that it hardly needs the citation of authority. A gift *inter vivos* requires the consent of the giver to divest the very thing given in order to transmit the title to the donee gratuitously; and the donee accepts and acquires legal title to it. There must be a definite article or thing which is the subject of the gift, and present intent of the donor to pass title, followed by delivery of the thing which is the subject matter of the gift. Needles v. Shenandoah National Bank, 202 Iowa 927, 211 N. W. 392; In re Brown's Estate, 113 Iowa 351, 85 N. W. 617; Tucker v. Tucker, 138 Iowa 344, 116 N. W. 119; Haulman v. Haulman, 164 Iowa 471, 145 N. W. 930; Vosburg v. Mallory, 155 Iowa 165, 135 N. W. 577, Ann. Cas. 1914C, 880. The evidence in this case does not rise to the requirements of these rules in order to constitute a gift. In other words, there must be a definite article or thing which is the subject of the gift. It must be given by the donor with the intent to pass title, and must be delivered to and accepted by the donee. Such is the rule of all of our cases. This theory of gift is not supported in the instant case because there is no showing of the contents of this bundle of papers, and there is no showing that the father intended to part with and pass the title thereto to the son. So, therefore, there is no question of gift involved in this case.

■■■ As heretofore stated, there was much correspondence between the plaintiff and his father and Carrie relative to an attempt to divide the father's property, and the plaintiff claims that an agreement was actually made by which all the property in Florida was to be the property of the plaintiff and all the property in Iowa was to be the property of Carrie. We have read this correspondence, and the telegrams relative to the same

matter, and we do not find any time when there was a meeting of the minds of the parties. In all this correspondence, each party is suggesting changes and conditions that should be made in such an agreement, and at no time did they reach a definite agreement which was made on one side and accepted on the other.

It is further insisted that because the Iowa real property was deeded to Carrie, and certain of the other property was given by the deceased to Carrie and accepted by her, she was estopped from denying the existence of this alleged agreement. We do not think that the claim of estoppel herein is valid or is in any way controlling in the case.

The evidence shows that the deceased had a strong box in which he kept his papers, and that after his death, when the plaintiff and the defendant opened this box it contained a deed to the Iowa property to Carrie and certain assignments of Florida mortgages to the plaintiff. There seems to have been no question raised at the time. The deeds and other instruments conveying property to Carrie were turned over to her by the plaintiff, and the assignments of certain Florida mortgages were turned over to the plaintiff. This was all done by mutual consent. There was something like $17,000 in securities in the bank in the name of W. J. and Carrie. The plaintiff raises no question about Carrie's right to these securities, and the money on deposit in the bank, except as to one item which will be hereafter referred to.

When this case is hulled to the nut the only matter that the plaintiff seeks to have adjusted between him and the defendant involves four loans known as the Rosegarten mortgage, the James mortgage, the Williams mortgage, and the Everhart loan. There is no showing that the Everhart mortgage, or the proceeds thereof, ever came into the hands of Carrie, and therefore she cannot be called upon to account for the same. As to the James mortgage, in the inspection of the papers in the private box of W. J. Woodward after his death was found an assignment of this mortgage to Bessie Woodward. The plaintiff made an adjustment with Bessie Woodward in relation to the same, and no part of the same or the proceeds thereof ever came into the hands of Carrie Woodward, and therefore she cannot be asked to account for the same. As to the Williams mortgage, in the same strong box was found an assignment of that mortgage to Carrie Wood-

ward. At this point there is a conflict in the testimony. She testifies that the plaintiff said, "If that is the way Father wanted it, it is all right"; and told her to have the assignment recorded, which she did. He denies this, but she is corroborated by a witness who heard him make the statement that she should have this assignment recorded. The Williams mortgage, however, has never been paid, and plaintiff has that mortgage and note. We are not called upon at this time to pass upon the question as to which of these parties is entitled to the proceeds of that mortgage and note, by reason of matters hereinafter referred to.

The Rosegarten mortgage and note has had somewhat of a stormy career, but whatever may be said about it, the same was paid and the money forwarded to W. J. Woodward during his lifetime. The plaintiff insists that this was to make a cushion or security for his alleged promise to pay the father $1200 a year. The money was deposited by the father in the joint account of himself and his wife, and a large part of it was invested in United States Government bonds, which were found in the lock box in the bank after his death. So long as we are finding that there was no actual contract between these parties which resulted in a settlement, we are disposed to hold to the idea that the plaintiff is not in a position to call upon the defendant to account for the same.

In view of the apparent existence of this will and the fact that the heirs of the dead son are not parties to this case, we do not think we are in a position to determine the rights as between the plaintiff and the defendant to the property in controversy. It is true that if the will is successfully probated those heirs would be cut out, but until that is done we do not think there is any occasion to call upon the widow to account.

Summarizing, therefore, we hold that the plaintiff has not made out a case which will warrant this court in holding that there was a gift from the father to the son of the property in controversy, or holding that the widow is a trustee of the property in question in favor of the plaintiff. Nor do we think that the doctrine of estoppel applies under the record made. The district court was right in its finding that the plaintiff has not made out a case for an accounting, and in dismissing the plaintiff's petition.—Affirmed.

PARSONS, C. J., and MITCHELL, KINTZINGER, HAMILTON, RICHARDS, STIGER, and DONEGAN, JJ., concur.