LOUISE DURO SHAW, Individually and as Administratrix,
Appellant, v. EVELYN IRENE DURO ADDISON, Appellee.

No. 47012.

(Reported in 28 N. W. 2d 816)

378

380

SEPTEMBER 16, 1947.

REHEARING DENIED MARCH 12, 1948.

Steward & Crouch and Holliday & Myers, all of Des Moines, for appellant.

Parrish, Guthrie, Colflesh & O'Brien, of Des Moines, for appellee.

MULRONEY, J.—The decedent, John Heber Duro, was born in England in 1881 and came to the United States and to Des Moines in 1903. For a time he worked as a coal miner and later engaged·in various businesses, including what appears to be a dominant relationship with various corporations engaged chiefly with coal-mining operations. He also engaged extensively in the buying and selling of bonds, stocks, and securities through various brokerage concerns. In 1907 he was married to Ella Gaedke and to this marriage one child, Louise, was born. His wife died in 1919, when Louise was about seven years old, leaving a will naming her husband as executor and leaving all her property to Louise. John Heber Duro qualified as executor but never filed an inventory or any other reports in the estate and the evidence does not disclose just what the estate consisted of, except that it did include the Forty-fourth Street home in Des Moines, which was in Mrs. Duro's name at the time of her death. The Forty-fourth Street home was occupied by John Heber Duro at the time of his wife's death and he lived there until his death in 1941.

In 1920 John Heber Duro's sister Evelyn came from England to reside in the Duro home. She was about twenty years old at the time she arrived and she helped to supervise the home and daughter, Louise. She did not engage in any gainful occupation but she received her living expenses, clothing,

and spending money, and gifts as hereinafter set forth. When John Heber Duro died, on April 10, 1941, he left an instrument dated December 29, 1939, purporting to be his last will and testament, in which the defendant was named as sole beneficiary and executrix. After the instrument was admitted to probate, and after a trial in the district court of Polk county, it was set aside on the ground that it was obtained by undue influence of defendant, and defendant was ordered to surrender all of the property of decedent in her hands or under her control to her successor. The case was appealed to the supreme court, where it was affirmed. See Shaw v. Duro, 234 Iowa 778, 14 N. W. 2d 241. While serving as executrix of the estate of John Heber Duro, defendant filed an inventory in the estate setting out and describing real estate and personal property of decedent in the amount of the approximate value of $75,000, which property was surrendered to her successor, Louise Duro Shaw. Thereafter Louise Duro Shaw instituted discovery proceedings, in which defendant was examined, for the discovery of assets under section 11925, Code, 1939 (635.14, Code, 1946). In the present action plaintiff, as administratrix and as sole heir of decedent, alleges that in addition to the property inventoried by defendant while serving as executrix, she is possessed of other property in excess of $300,000 belonging to the estate. We will hereafter refer to Louise Duro Shaw, as administratrix and as sole heir, as the plaintiff.

While we will discuss the pleadings and specific issues as to the property involved as we proceed, it seems necessary at the outset to state what appears to us to be the general theory of plaintiff's case. In the various paragraphs of plaintiff's petition she alleged the decedent had transferred shares of stock to defendant upon the books and records of certain corporations, and that he made, executed, and had recorded a deed to a farm purportedly conveying the farm to defendant. She alleged in effect that the transfers of the stock and the conveyance of the farm were without consideration, for convenience only, and procured by the domination and undue influence of defendant. In the prayer of her petition she asks: "* * * that the various transfers and conveyances aforesaid, by and through which the defendant holds or claims to hold legal

title to the real and personal property * * * be set aside; that the court decree that the defendant holds no part of said * * * property as absolute owner but only as trustee for the decedent and his heir." In plaintiff's "Statement of the Case" in her brief she states:

"The plaintiffs allege and claim in substance that the decedent, John Heber Duro, transferred said property into the name of the defendant as a matter of convenience only, that said transfers were merely colorable without consideration and were induced and procured by fraud, deceit and undue influence of the defendant. The plaintiffs ask the court to decree that said properties were and are in the name of the defendant impressed with a trust; that the defendant has no right, title or interest in said properties except that of a trustee * * * for the decedent and his heirs."

From the foregoing we feel we are safe in assuming that plaintiff seeks recovery as to the property the decedent transferred to the defendant on the theory of a resulting or constructive trust. We are a little shaken in this belief because of the almost complete lack of discussion in plaintiff's brief of any of the principles of law governing resulting or constructive trusts and the dearth of authority cited in support of recovery on the theory of a resulting or constructive trust. The briefs and arguments are long. We are told the case took thirteen weeks to try and the appeal was allowed on the transcript of testimony and exhibits, but in the three hundred pages (in plaintiff's eleven hundred pages of brief and argument) which plaintiff devotes to a discussion of the principles of law involved we find no brief point touching the law of resulting or constructive trusts.

In her brief plaintiff states that she relies upon the proposition that her ownership of all the properties here involved was established, so we will assume she means, as to the property transferred by decedent to defendant, it was established on the theory of either a resulting or constructive trust.

I. Usually a resulting trust involves the situation where the party claiming that a trust resulted furnished the

consideration or purchase price, but the property was conveyed by the seller direct to another person, who is sought to be held as trustee for the benefit of the party supplying the consideration. Whether this type of resulting trust is involved in this case and is within the range of the pleadings is somewhat doubtful, but the parties seem to argue this type of resulting trust as to some of the property involved. The other general type of resulting trust, and one which is directly involved here, is where property is transferred without any consideration coming from the transferee and it appears from all the circumstances that he is holding the property for the benefit of the transferor. 65 C. J., Trusts, section 139; Acker v. Priest, 92 Iowa 610, 61 N. W. 235; Dunn v. Zwilling Bros., 94 Iowa 233, 62 N. W. 746; Williams v. Williams, 108 Iowa 91, 78 N. W. 792. The doctrine of resulting trust is operative whether the property involved is realty or personalty. 54 Am. Jur., Trusts, section 193.

II. The plaintiff has the burden of proving all facts necessary to establish a resulting trust. The proof necessary to establish such a trust must be clear, convincing, and satisfactory. See the review of many decisions of this court, by Justice Bliss, in Sinclair v. Allender, 238 Iowa 212, 26 N. W. 2d 320. In that case we held the rule had been phrased in various ways, but the rule first announced, by Chief Justice Wright, in Noel v. Noel, 1 (Clarke) Iowa 423, 425, still has vitality. The rule as expressed in the Noel case is:

"The legal title is concededly in the defendant. To divest it, upon grounds that he holds it, or any part of it, as trustee for the complainant, the testimony should be clear and satisfactory. It is a rule, too well understood to need repetition, that parol testimony to establish such trust should be received with great caution, and should be clear, and such as goes distinctly to prove the facts necessary to create such resulting interest. The testimony must not be loose and equivocal. It is contrary to every correct principle, that the legal title should be divested upon parol testimony, which is not clear, satisfactory, and distinct."

We will now consider how plaintiff discharged her burden

with reference to the properties involved. There were two transfers of stock by decedent to defendant, admittedly without consideration, which should be considered at the outset, for upon the validity of these transfers rests plaintiff's right to recover much other property described in her petition.

■ III. On or about July 3, 1922, decedent transferred to defendant 290 shares of stock in the Des Moines Ice & Fuel Company of the par value of $29,000. Defendant alleged this property was transferred to her as a gift. While this stock in its original form is not now involved in this case, it nevertheless enters into other transactions, inasmuch as the proceeds from a subsequent reorganization are traceable into other properties involved. The trial court held the defendant proved a valid gift of the above stock to defendant.

When this transfer was made the defendant was about twenty-two years old and she had been in the United States about nineteen months. The decedent was forty-one years old and he was a successful and experienced businessman and in full possession of good health and mental faculties. The record would indicate that at the time the stock transfer was made decedent was a wealthy man. The record shows that in 1920 he paid federal income tax in the sum of $4,729.25. And a financial statement filed by defendant in 1924 would indicate that he was at that time worth about $300,000. The decedent was secretary of the corporation, at a salary of $10,000 a year, and he signed the stock certificate issued to defendant as secretary of the corporation. The evidence of defendant was that decedent gave her the stock in his office in Des Moines; that there were words of gift accompanying same; that she examined the stock certificate and identified the signatures of the president and the decedent, who was secretary of the company, and that the stock was left in her brother's safe. The words of gift testified to by defendant are contained in the statement by decedent: "Well, I think this will be security for you. Now I can face my mother and tell her that I kept my promise." There was other testimony that decedent had promised his mother to take care of defendant and make financial provisions for her if the mother would let her come to America.

Plaintiff's chief contention is that there was no delivery and that decedent retained control and dominion over the property. The evidence of defendant was that decedent gave her the stock. This was admitted in evidence as a part of the interrogation of the defendant in the discovery proceedings. Incompetency of the witness under the dead man statute (section 622.4, Code, 1946) was waived by plaintiff's reading a part of the discovery proceedings regarding this transaction. We think the evidence of 'delivery was sufficient. The fact that the certificate was left in her brother's safe would not show there had not been any delivery. The defendant, so far as the record shows, did not at this time have a lockbox, and in any event a gift of corporate stock is generally complete where the owner directs the transfer to the donee on the books of the corporation even though the donor retains the new certificate issued in the name of the donee. Leedham v. Leedham, 218 Iowa 767, 254 N. W. 61; 24 Am. Jur., Gifts, section 80; 99 A. L. R. 1080.

Plaintiff's argument that decedent did not part with dominion and control over the stock is based upon his having possession of the certificate and the fact that he received the dividends on the stock. We have already pointed out that his possession of the certificate was immaterial. The record shows the dividend checks were made out and sent to defendant and endorsed by her, and it can be said that the record fairly shows that the dividends for 1923 and 1924 were deposited in J. H. Duro's bank account in the Mechanics Savings Bank in Des Moines; that at this time defendant had no bank account; and that defendant had a right to, and did, draw checks on the above bank account. There is no record as to where the 1925 dividend was deposited and the 1926 dividend was deposited in J. H. Duro's bank account in the Des Moines National Bank. But the record shows decedent, in his own handwriting, prepared the federal income-tax return of defendant for the calendar year 1926 and showed in that return the dividends on the stock as the income of the defendant, and the record also shows the 1925 dividends on this stock were reported on defendant's income-tax return for that year.

There was other evidence of statements by decedent to other persons that he had given the stock to defendant.

During the year 1926 the property of the Des Moines Ice & Fuel Company was acquired by the Central Service Company and a plan of reorganization was submitted to the stockholders. The record shows defendant signed the reorganization agreement and personally delivered the stock certificate to the Bankers Trust Company, the escrow agent, and pursuant to the agreement she received $75 cash for each of the 290 shares, or $21,750, and 217½ shares of stock in the Central Service Company. The cash was deposited in her account in the Bankers Trust Company and the certificate in her name for 217½ shares of Central Service Company was placed in the joint lockbox of decedent and defendant, where it remained until decedent died. The quarterly dividends of about $380.63 were deposited in defendant's bank account until about 1934, when her bank account for some reason became inactive and the dividend checks were deposited in decedent's bank account or in a joint bank account until 1940, when the dividend checks were again deposited in defendant's account. The deposits of these dividends in decedent's account were often initialed "E. I. D." or "Rene." There was other evidence of income-tax returns and work sheets prepared often by decedent during many of the years when the dividend income from the Central Service Company stock was shown to be defendant's.

IV. On February 28, 1929, 600 shares of stock in the Great Western Coal Company were transferred into the name of defendant upon the books of the corporation. Defendant claims that said stock was a gift from decedent. The trial court held defendant failed to prove the essential elements of a gift; that the statute of limitations and laches did not apply to this transaction for the reason that at the time of the transfer, and continuously up to the time of decedent's death, a relation of trust and confidence existed between defendant and the decedent in which defendant did exercise a dominant influence over decedent; and that decedent at all times remained the owner of said stock, and defendant never had any title thereto except that of trustee.

The documentary evidence established that certificate No.

25 for 600 shares of Great Western Coal Company stock was issued by the company to defendant on February 28, 1929; that said certificate is in the handwriting of J. H. Duro as president of said corporation and signed by him as president; that the stub of said certificate in the corporation's stock book is in the handwriting of decedent, except for the signature receipting for the certificate which is in the handwriting of defendant. There was some discrepancy in defendant's testimony given in the discovery proceedings, where she testified the certificate was left in the office of the Great Western Coal Company, while in this trial she testified she deposited it in the joint safe-deposit box in the Bankers Trust Company. Incidentally, the stock book also shows that 200 shares were issued to Louise on February 19, 1929, and the minutes show that at subsequent stockholders' meetings defendant's ownership of the 600 shares was recognized. There was evidence that decedent told other persons that defendant owned this stock.

There is no question but that the stock issued to both defendant and Louise was previously owned by J. H. Duro or acquired by him shortly before by purchase from H. H. Polk. The stock did not ever pay any dividends, but at a special meeting of the directors in 1939, the president, decedent, was authorized to purchase defendant's 600 shares for $26,678.86, and decedent, as president of the company, drew a check to her for that sum and she surrendered the stock. This check was used in a complicated reorganization plan whereby the Orilla Coal Company was formed and defendant emerged with 50 shares of stock in the latter company and the Orilla Coal Company's note in the sum of $15,143.21. We need not go into the reorganization plan for plaintiff admits the note and stock were defendant's if a valid gift was established.

V. Plaintiff argues the two transactions were similar. We, too, think they were. She seeks to reverse the trial court in the first transaction and sustain the trial court in the second by one argument to the effect that the evidence shows (1) no valid gifts were shown because one or more of the essential elements of a gift were lacking (2) the transfers

were the result of undue influence (3) the transfers were merely for convenience.

It was plaintiff's theory that the burden was on defendant in each instance to establish by clear and satisfactory proof that all of the essential elements of a gift inter vivos were present in each transfer. Defendant conceded she had such burden. Defendant conceded far too much. As previously pointed out, the burden is upon the party seeking to establish a resulting trust to establish by clear, convincing, and satisfactory proof all of the facts necessary to give rise to such a trust. Plaintiff seems to rely on the frequently stated rule that:

"Where one seeking to have a resulting trust declared shows with requisite sufficiency a conveyance to one person on a consideration from another, the burden of proof of the facts giving rise to a resulting trust is sustained." 54 Am. Jur., Trusts, section 603.

The above authority points out that after such a showing "the burden of going forward is then on the other party to rebut the resulting trust by showing that the party from whom the consideration moved did not mean the purchase to be a trust for himself, but a gift to the grantee." Plaintiff also relies to a large extent on the decisions of this court where we have held that possession of personal property, originally bought and acquired by the alleged donor, does not give rise to a presumption of gift.

But the rule that a prima facie case of resulting trust is established by showing the consideration moved from the claimant has no application with respect to these transfers for two reasons. In the first place, in both instances the decedent transferred his own property. The rule only has application in the purchase of property where the title moves direct from the seller to one who does not furnish the consideration. There is no rule of law that creates a presumption of resulting trust in transferor's favor when he transfers his own property to another without consideration. The rule is thus stated in Restatement of the Law, Trusts, section 405:

"Where the owner of property transfers it without declaring any trust, the transferee does not hold the property upon a resulting trust although the transfer is gratuitous.

"a. The common-law rule that a resulting use arises in favor of a person making a feoffment in fee simple to another where no consideration is paid for the feoffment and where no express use is declared by the feoffer, has not been applied in the modern law of trusts. Where a transfer of property is made without consideration, the inference is that the transferor intends to make a gift to the transferee, not that he intends that the transferee should hold the property for the benefit of the transferor. This is true even though it appears in the instrument of conveyance that no consideration is paid for the conveyance."

See, also, 65 C. J., Trusts, section 153; 54 Am. Jur., Trusts, section 302. In the second place, the rule has no application under the evidence in this case because whether the claim of resulting trust be of either type, that is, because of supplying the consideration, or because of other circumstances in a direct transfer from the alleged donor of his own property, there is a counterpresumption that a gift or advancement was intended when the conveyance is to a person that the party paying the consideration or transferring his ~ vn property was under a legal or moral obligation to s.. _ rt. 65 C. J., Trusts, section 169; Sinclair v. Allender, 238 Iowa 212, 26 N. W. 2d 320, and cases there cited; Hoon v. Hoon, 126 Iowa 391, 102 N. W. 105.

We need not review all the testimony showing defendant's position in the Duro household. The evidence establishes that defendant came to the Duro home at the invitation of decedent, after his wife's death, to run his house and take care of his motherless little girl. We need but quote from plaintiff's brief and argument to show that the necessary relationship was established as follows:

"Under all the evidence we think it may fairly be concluded that this was a mutual benefit arrangement. Mr. Duro, was, no doubt, happy to have his sister supervise his mother-

less home, and Irene was, no doubt, more than anxious to join her brother in America."

And with respect to the obligation to support defendant, the plaintiff in her argument states:

"However, we have no doubt that Irene's mother wanted assurance that John Duro would look after Irene. Neither do we entertain any doubts that John Duro did assure his mother that he would 'take care of' Irene."

With such a relationship established the presumption of gift arises. In addition to the many cases cited in Sinclair v. Allender, supra, see Finnegan v. Hernandez, 74 Cal. App. 2d 51, 168 P. 2d 32; Strong v. Strong, 136 N. J. Eq. 103, 40 A. 2d 548; Frank v. Eeles, 152 Fla. 869, 13 So. 2d 216; In re Cunningham's Estate, 19 Wash. 2d 589, 143 P. 2d 852; Northern Trust Co. v. Huber, 274 Pa. 329, 118 A. 217.

Our holding as to the burden of proof is not in conflict with the previous holdings of this court, many of them cited by plaintiff, to the effect that possession of personal property originally bought and acquired by the alleged donor does not give rise to a presumption of a gift. This rule has been applied with respect to bonds, where the bonds were capable of being transferred by mere manual delivery, and where the undisputed record shows they were bought and owned by decedent and the very transfer is being attacked, and usually a showing is made of mutual accessibility to the property by the decedent and the party claiming title by gift. Malcor v. *Johnson, 223 Iowa 644, 273 N. W. 145, and Bosserman v. Watson, 230 Iowa 627, 298 N. W. 804, are cases of that type. In the present case the undisputed record shows the stock was transferred by the decedent to the defendant. The applicable rule is contained in our holding in Needles v. Shenandoah Nat. Bk., 202 Iowa 927, 211 N. W. 392, where we held that a mother who apparently transferred certain notes to her children by a writing containing directions for the delivery of the notes had the burden of showing that a gift was not intended. See, also, Krull v. Arman, 110 Neb. 70, 192 N. W. 961, and Nolan v. American Telephone & Telegraph Co., 326 Ill. App. 328, 343, 61 N. E. 2d 876, 882. In the last-cited case the court stated:

"Since Nolan was unquestionably the owner of this stock when he caused it to be transferred to plaintiff on the books of the defendant company and a new certificate issued in her name on June 12, 1936, such transfer constituted a constructive or symbolic delivery of the stock to her (Chicago Title & Trust Co. v. Ward, 332 Ill. 126) [163 N. E. 319], and since it is presumed that when a father transfers or delivers property belonging to him to his daughter a gift of same is intended, the burden was on defendant to prove that Nolan did not intend to make a gift of the stock to plaintiff."

■ The rule as stated in 38 C. J. S., Gifts, section 65b, is:

"If an unqualified transfer to the donee is proved, one asserting that the delivery was made on some condition or trust has the burden of establishing such condition or trust."

■ The plaintiff at all times had the burden of proving that the transfers were not gifts; that no gift was intended; that the transfers were impressed with a trust in the transferor's favor, by clear, convincing, and satisfactory evidence. She fell far short of the degree of proof necessary. We think the record abundantly shows gift transactions in each instance. The mass of evidence tracing the proceeds and dividends, a part of which were used in later transactions by the decedent, constitutes a futile attempt to show a resulting trust. "An absolute gift cannot be cut down by implication into a trust by events transpiring after it is made." 38 C. J. S., Gifts, section 8. See, also, Vickers v. Vickers, 133 Ga. 383, 65 S. E. 885, 24 L. R. A., N. S., 1043; Guenther v. Guenther, 244 Wis. 386, 12 N. W. 2d 727; O'Donnell v. O'Donnell, 305 Ky. 60, 202 S. W. 2d 999, 1000. In the last-cited case it is stated:

"Furthermore, whether a trust results or a settlement or advancement is presumed depends generally upon the character of the transaction at its inception, and not upon subsequent acts or declarations."

That decedent might have used some of the income in later transactions, which might or might not have been for defend-

ant's benefit is not clear, convincing, and satisfactory evidence that at the time of the transfer she was under an obligation to hold the property in trust for him.

VI. There is not any evidence in the record to the effect that the transfers were influenced in any manner by the defendant. At the time of the second transfer the decedent was forty-eight years of age and defendant was twenty-nine. The undisputed record is that for many years prior to 1929 decedent was a forceful, aggressive, and successful businessman. He had acquired complete control of the Great Western Coal Company. It is clear from all the testimony that decedent dominated each transaction. Plaintiff did not testify as to anything which occurred prior to 1929 which would be considered as evidence of any undue influence exercised by defendant. The other witnesses who testified to incidents tending to show defendant exercised influence over the decedent either did not know the Duros in 1929 or placed the beginning of her influence when decedent became sick in 1933. A neighbor testifying for plaintiff said the decedent, up until he became sick, "had a quick mind" and that he was a "strong character" and "when he wanted anything he went after it and generally got it." Indeed, plaintiff does not argue that there is any evidence that would support a finding that defendant exercised a "dominant influence" over decedent at the time of either transaction. In each instance plaintiff argues defendant has the burden of proving that the transfers were not the result of overreaching or undue influence on her part, because of the conceded relationship of trust and confidence, and that defendant failed to discharge her burden. Defendant in her answer conceded that a relationship of trust and confidence existed between herself and decedent but denied that she became the dominant party in said relationship or that she dominated or unduly influenced the decedent. Plaintiff argues in effect that whenever a confidential relationship exists between the parties to a gift transaction the burden is on the donee to show freedom from undue influence; that the only prerequisite to the application of the rule casting the burden of proof on the donee is that a relationship of trust and con-

fidence be shown; and that here it was admitted, so the rule is applicable. Her argument is that the law "implies a condition of superiority and raises a presumption of undue influence." Plaintiff cites a number of cases but in all of them the evidence shows the donor was old, feeble, mentally incompetent, or had not the capacity to transact business and that the donee was the dominant party to the trust relationship. No case is cited by plaintiff where the law implies that the donee was in the dominant position merely because of the relationship of trust and confidence. In 38 C. J. S., Gifts, section 67c, it is stated:

"* * * where the relationship of the parties is confidential in character, so as to cast suspicion on a gift from the servient to the dominant person, greater proof may be required than if no such relationship existed."

And:

"* * * where the relationship of the parties is confidential *and the alleged donee is the dominant party,* clear and convincing evidence will be required to show absence of fraud or undue influence and to sustain the validity of the alleged gift." (Italics supplied.)

In 17. Am. Jur., Duress and Undue Influence, sections 38 and 39, the rule is stated:

"The burden of proving the existence of such a confidential relation as raises the presumption of undue influence rests upon the party who asserts it. * * * A presumption of undue influence arises from transactions between persons standing in certain confidential relationships, in which the dominant party thereto is the grantee or other beneficiary of the contract."

The rule is thus stated in 65 C. J., Trusts, section 228:

"In general, a confidential relation, or fiduciary relation, the two terms being ordinarily used interchangeably, within the meaning of the rule that a constructive trust arises from the abuse or violation of such a relation, exists wherever con-

fidence is reposed on one side and there is a resulting superiority and influence on the other."

See, also, Humphrey v. Norwood, 213 Iowa 912, 240 N. W. 232.

Plaintiff had the burden of proving either that defendant exercised undue influence or a relationship of trust and confidence in which defendant was the dominant party. She did neither. All the evidence shows the decedent was the dominant party to the trust or confidential relationship. Plaintiff does not seem to argue otherwise. It is our conclusion no fraud or undue influence was established and no relationship proven from which fraud or undue influence could be inferred and hence no constructive trust in the transferor's favor was established by the evidence.

VII. Plaintiff argues that the transfers were in the furtherance of a plan by the donor to escape income tax. The argument is rather inconsistent with the claim of undue influence. The motive with which a gift is made, whether good or bad, does not affect its validity. 24 Am. Jur., Gifts, section 49. This argument of plaintiff's is developed under her theory that the transfers were a mere matter of convenience to the donor, presumably under a promise by the donee that she would give the property back after the tax was successfully evaded. Plaintiff cannot secure a decree of reconveyance in a court of equity on such a theory. See Delgado v. Delgado, 42 N. M. 582, 82 P. 2d 909, 118 A. L. R. 1175; annotation 118 A. L. R. 1184; 24 Am. Jur., Fraudulent Conveyances, section 118; 12 Am. Jur., Contracts, sections 168, 209; Sheldon v. Pruessner, 52 Kan. 579, 35 P. 201, 22 L. R. A. 709.

Plaintiff, as heir of the donor, had no rights superior to those of the donor at the time of his death. The transfer which has for its object and purpose the evasion of taxation is analogous to transfers to defraud creditors, about which more will be said in the next division of this opinion. In both cases the parties are in pari delicto and no relief will be granted the transferor in equity but the law will leave them where it finds them. The equitable maxim "he who comes into equity must come with clean hands" governs the court's action. No result-

ing trust that a court of equity will enforce is established in favor of the transferor or his successor upon proof of a transfer made for the purpose of evading tax.

VIII. In October of 1931 the decedent transferred a farm known in the record as the Runnells farm to the defendant. The deed naming E. Irene Duro as grantee was dated October 14, 1931, and filed for record October 19, 1931.

Evidence showed that prior to the transfer Mr. Duro owned two farms near the town of Runnells. The farm here involved was unencumbered but the other, an adjoining farm, was mortgaged for $30,000 to the Chicago Joint Stock Land Bank. Petition for foreclosure of the mortgaged farm was filed June 20, 1931, and decree was taken October 21, 1931, with Mr. Addison Parker, a Des Moines attorney, appearing for defendant. Mr. Parker testified he drew the deed to Irene because decedent had expressed himself as fearful of the deficiency judgment in the foreclosure action. Frank Santi, the tenant, testified Duro told him he turned the farm over to his sister so he would not have trouble with the Chicago Joint Stock Land Bank, and Louise testified that shortly before the transfer her father told her that he was afraid he was going to lose the other farm to the land bank and he thought he would transfer it into defendant's name so he could keep it. A deficiency judgment was taken against decedent in the foreclosure action in the sum of $10,000, which was not settled until August 26, 1935. There was other evidence tending to show decedent exercised some control over the farm during some of the years following the transfer, but we can, to a large extent, adopt plaintiff's analysis of the evidence, which is:

"The overwhelming and just about the only credible and convincing evidence points to the inevitable conclusion that the real intent and purpose of John Duro was to merely place the legal title in the name of defendant in trust for himself in order to avoid the lien of a deficiency judgment."

At least, plaintiff practically concedes the evidence establishes a transfer to hinder, delay, or defraud a creditor.

There was no evidence of undue influence on defendant's

part and all the evidence showed the decedent was the dominant party to the transaction. Plaintiff again makes slight reference in argument that the burden was on defendant to show freedom from undue influence, but states:

"In view of the unquestioned situation surrounding the mortgage foreclosure and the danger of a deficiency judgment we think this property was placed in defendant's name as trustee more as a matter of convenience that as a result of undue influence."

The trial court held this farm was transferred into the name of defendant as a matter of convenience without any intention of making a gift, and accordingly set aside the transfer.

The evidence presents the question as to whether a transfer to hinder, delay, or defraud creditors will be set aside in an equitable action by the transferor or his successor. We have held that it will not. In Weir v. Day, 57 Iowa 84, 86, 10 N. W. 304, 305, it was stated:

"If the plaintiff caused the conveyances to be made to the defendant with intent to hinder, delay or defraud his creditors, or any of them, he is not entitled to recover. Holliday v. Holliday, 10 Iowa, 200; 1 Story Eq. Jur., 61; Kerr on Frauds and Mistake, 375; Stephens v. Harrow, 26 Iowa, 458."

See, also, Briggs v. Coffin, 91 Iowa 329, 59 N. W. 259; Barth v. Severson, 191 Iowa 770, 183 N. W. 617; Fulton v. McCullough, 232 Iowa 1220, 7 N. W. 2d 910. The rule as stated in 37 C. J. S., Fraudulent Conveyances, section 271, is as follows:

"Where a conveyance * * * of property is made by a debtor for the purpose of defrauding his creditors, the courts will not enforce a trust, such as a resulting or constructive trust or a secret trust in such property for the benefit of the debtor, or those in privity with him, against the grantee or transferee."

As stated in 24 Am. Jur., Fraudulent Conveyances, section 118:

398

"As a general rule, subject to certain modifications and exceptions hereinafter noted, where the contract for conveyance of the property has been executed by the parties, neither the transferrer nor the transferee may claim relief from the consequences thereof. The law will leave them in the position in which they have placed themselves, refusing affirmative aid to either of the fraudulent participants. This is true not only as to the original parties to the fraudulent transaction, but also as to their heirs and all other persons claiming under them, no equitable rights having intervened to protect the complainant. The equitable maxim, 'he who comes into equity must come with clean hands,' governs the court's action in the circumstances. This rule has been applied in the case of a transfer made for the purpose of evading taxation."

For a case quite directly in point, see Englund v. Berg, 70 S. D. 334, 337, 17 N. W. 2d 638, 639. In that case the father transferred a farm to his daughter to escape a possible deficiency judgment he was fearful would be rendered against him in a foreclosure action involving another farm. After the father's death his administrator brought suit to set aside the transfer and the lower court set aside the transfer and held decedent's heirs and devisees were entitled to the farm. Upon appeal the supreme court reversed, stating:

"It is the general rule that, when a conveyance is made solely to prevent a creditor of the grantor from collecting the amount of a judgment that might be recovered against him, a court of equity will not grant relief from such fraudulent conduct, on behalf of either the grantor, or his heirs or assigns. Jones v. Jones, 20 S. D. 632, 108 N. W. 23; Grigsby v. Larson, 24 S. D. 628, 124 N. W. 856; Kjolseth v. Kjolseth, 27 S. D. 80, 129 N. W. 752; Bucknell v. Johnson, 39 S. D. 212, 163 N. W. 683."

The mere fact that a relation of trust and confidence exists between the grantor and grantee will not authorize a court of equity to afford relief to the grantor in a fraudulent conveyance. 37 C. J. S., Fraudulent Conveyances, section 262. There is some authority for the proposition that where the

parties are not in pari delicto a court of equity may grant relief, but the parties will be considered in pari delicto unless there is a showing that the grantee procured the conveyance by undue influence. 37 C. J. S., Fraudulent Conveyances, section 262. See, also, All v. Prillaman, 200 S. C. 279, 20 S. E. 2d 741, 159 A. L. R. 981.

We hold that under the record, where, as the plaintiff admits, it is firmly established the conveyance was in fraud of creditors, plaintiff was not entitled to any recovery and the court was in error in setting aside the transfer.

■■■ IX. The foregoing, with the exception of some bonds of little value which will be dealt with later, and a few items of tangible personal property, are the only transfers of property from decedent to defendant, admittedly without consideration. In plaintiff's brief we find the statement:

"If the so-called gifts were invalid so that the ownership remained in the decedent then it would necessarily follow that the ownership of the property in which the income and proceeds were invested would remain in the decedent, and the ownership of the property for which the subject matter of the alleged gift was exchanged would likewise remain in the decedent."

Of course, the converse of that proposition would likewise be true and if the gifts were valid the ownership of the property in which the income and proceeds were invested would be in defendant.

The evidence shows that on or about December 4, 1926, the defendant became the owner of $12,500 worth of Great Western Coal Company bonds. Decedent was the president and general manager of the company, owning 493 shares of the outstanding 1,000 shares of stock.

On December 30, 1926, there was a notes-payable account in said corporation in decedent's favor of $20,000. On said date this note account was transferred into the name of defendant. The defendant alleged the transfer was made to her for a good and valuable consideration. She alleged that from time to time she loaned money to decedent for the Great Western

Coal Company. She testified that the source of the funds for the bond purchase and the loans was the $22,130.62 cash she received (on November 19, 1926) in the reorganization of the Des Moines Ice & Fuel Company. There is persuasive evidence that this and probably other income, such as the dividends received on the Des Moines Ice & Fuel Company stock, was the source of the funds in her account against which checks were drawn in the approximate amount of the bond purchase, and checks were drawn in favor of decedent in the approximate amount of the note account. There is evidence that the decedent, as president and general manager of the company, acknowledged the note account to be defendant's and that he told others the company was indebted to the defendant. The company retired its bonds at various times until in January of 1934 defendant held $6,500 worth of bonds which were all of the outstanding bonds of the company. In August of 1937 at a special meeting of the board of directors the company adopted a resolution to sell the mine farm to defendant for $10,000, the resolution reading that payment was to be made by relinquishment and cancellation through the trustee of the outstanding bonds, plus interest, and the balance to be paid in cash. The defendant thereafter surrendered her $6,500 worth of bonds to the trustee (Bankers Trust Company) and she received a receipt therefor and the trustee's release of the mortgage deed of trust securing the bonds. The record shows the balance of the purchase price was paid by a portion of the note account in her favor and deed to the farm was delivered to her. On the 16th day of August, 1937, at a special meeting of the board of directors a motion was adopted to sell all equipment, buildings, coal leases, and mineral rights owned by the company to defendant for $25,000. This was carried out and the payment was made by extinguishment of the balance due on the note account. It is quite useless to pursue the tedious testimony as to the further mining leases of this property. The plaintiff wholly failed to sustain her burden of proving by clear, convincing, and satisfactory evidence that a resulting or constructive trust arose in decedent's favor by reason of the transactions disclosed. As to the bonds, which furnished part of the consideration for the transfer of the mine farm to de-

fendant, the plaintiff's argument that decedent furnished the consideration is without any support in the record. This is not a case of the transfer of decedent's property to defendant. The plaintiff's argument is that decedent furnished the consideration for defendant's purchase of the bonds. The argument is based on pure surmise and, of course, upon a holding that the gift transactions were invalid to pass the beneficial interest in the prior stock transferred, so that defendant was without funds to pay the purchase price. We have held the Des Moines Ice & Fuel Company stock transfer created no resulting trust. The cash received by defendant in the sum of $22,130.62 in the reorganization of that company was probably the source of defendant's funds used as purchase price for the bonds. But we need not determine where the money came from. It is enough to state the plaintiff's evidence does not show by the necessary degree of proof that the money came from the decedent.

As to the note account the plaintiff did not introduce any evidence showing the transfer was without consideration. The documentary proof shows withdrawals from defendant's bank account of four checks in the sum of $17,000 in the month of December 1926. They have not been traced as to the payee or the purpose, save defendant testifies one check for $12,342 was for the bonds she purchased. Other checks from defendant's account in something over $5,000 in 1927 are traced directly to decedent. Defendant testifies she loaned the money to decedent. It is clear that plaintiff failed to make out a case. As previously pointed out, there was no relationship of trust and confidence in which defendant was the dominant character at the time of this transaction in 1926 so as to give rise to any constructive trust by reason of fraud. The trial court held for the defendant as to the mine farm and equipment and we are convinced the holding is correct.

X. At the time of decedent's death there was a margin account in defendant's name with Polk-Peterson Corporation, brokers, in which there were certain securities on deposit. The plaintiff alleged that the margin account was originally opened and carried in the name of Louise Dorothea Duro and was changed into the name of E. Irene Duro with-

402

out consideration and by the mere drawing of a line through the name of Louise Dorothea Duro and writing in the name of E. Irene Duro; that said margin account was carried in the name of E. Irene Duro without consideration, as a matter of convenience only, and a result of the undue influence of defendant. Defendant denied the allegations of plaintiff's petition and alleged in substance that the account in the name of the decedent or the plaintiff was, sometime prior to March 1, 1934, transferred to her in consideration of payments made by her into the account. There is not much question but that the account was the decedent's prior to January, February, or March 1934. And it is established that in one of the above months the decedent gave Polk-Peterson explicit and definite instructions to change the account into defendant's name. The mechanics of the change was accomplished by some employee of the latter company, acting upon direction of an official of the company, drawing a line through Louise's name on a ledger sheet and writing in the defendant's name. Miss Jones, secretary and treasurer of the Polk-Peterson Corporation, testified the decedent asked that the change be made and asked that all statements in the future be made in the name of defendant. She further testified that sometimes thereafter they would make a mistake and send out a statement in Louise's name or decedent's name and he would ask for a corrected statement. After the change was made the Polk-Peterson Corporation confirmed purchase and sale orders in this account on their usual confirmation form, addressed to defendant, and invoices of the transactions when executed were mailed to her.

The evidence establishes that this account was opened by decedent about 1932, and $170 was deposited in the account in 1932, the source of which is unknown. Over the years the account was in existence certain credits appear which are evidently checks of Polk-Peterson Corporation for dividends and interest on securities held by them in connection with the margin account and endorsed back to Polk-Peterson. Of the other deposits which might be termed "outside" deposits made into the account, it clearly appears that a great many of them were deposits of defendant's money.

Prior to March 1, 1934, there were deposits in this margin

account of $14,000. There were deposits of defendant's checks received from the Great Western Coal Company for interest on her bonds or credits on her note account. Plaintiff admits defendant can claim credit for these deposits, which total more than fifty per cent of all deposits made into the account prior to the transfer on March 1, 1934, if she is held to be the owner of the bonds and note. We have so held. As to the balance of deposits into the account from the date it was opened in 1932 to March 1, 1934, defendant produced receipts from Polk-Peterson Corporation showing nearly all of the deposits were received from defendant. These deposits were in the form of cash and checks, one check being defendant's own check on her bank account in the Bankers Trust Company for $1,775. Only one deposit during this period is shown not to be from defendant and this is a deposit of $853.11. It thus fairly appears that defendant sustained the allegation of her answer to the effect that the consideration for the transfer of the account to her was her payment into the account of some $13,000, if it be thought, as plaintiff contends, that she had the burden to establish this. There were other deposits into the account in later years, some of which can be definitely traced to defendant and some to decedent. It would unduly extend this opinion to show the source of each deposit. Withdrawals from the account were made during the years 1935 to 1937 in the form of checks from Polk-Peterson Corporation to decedent or defendant. The withdrawals totaled $60,692.97 and it is admitted that all of this sum was deposited in decedent's bank account in the Bankers Trust Company. There is evidence that the deposits were made in decedent's bank account with defendant's knowledge and consent and that during this period this bank account was the only bank account used for depositing income from property owned by either decedent or defendant. The evidence also indicates that the withdrawals from the Polk-Peterson margin account were used by decedent to finance his own margin account with Babcock-Rushton, an account he continued to the date of his death, and he succeeded in running this account to a value of $56,937.32 at the time of his death. Defendant, as executrix of decedent's estate fully accounted for the Babcock-Rushton (later Goodbody & Company) account.

As to the actual handling of the Polk-Peterson margin account, there is no question but that all trading was done upon decedent's order. The following quotation from plaintiff's brief fairly sums up the evidence:

"From the foregoing testimony of Mr. Landstorfer and Miss Jones it is readily apparent that the defendant not only knew nothing about securities, but that she had nothing to do with this account except to act as delivery girl and to occasionally relay Mr. Duro's orders when he was indisposed. In the words of Miss Jones, John Duro handled it absolutely. He was the one who * * * transacted the business. It is obvious from the testimony of these witnesses that they recognized the ownership, dominion and control of Mr. Duro over this account even though it was in the defendant's name."

That Polk-Peterson recognized decedent's "ownership" might be said to be a conclusion, but it is clear that decedent did exercise dominion and control in the sense that he gave the buy and sell orders.

There was other evidence to the effect that decedent represented and admitted to Polk-Peterson Corporation employees and others that the Polk-Peterson account belonged to defendant. Frank Ryan, an attorney who acted as attorney for decedent when he was receiver of the Duro Brothers partnership, testified he knew decedent very well. He was at first a witness for plaintiff but later the defendant called him and he testified as to a conversation with decedent, probably in 1939 or 1940, as follows:

"Subsequently I talked with him. I remember that he was in his room at the time and he spoke about, that he was flat broke at one time and that Irene let him have something like $16,000 of her own money and by the use of that he was able to accumulate a considerable amount."

Later, on redirect examination, he testified: "It was the same conversation in which he told me that Irene had put in of her own money, $16,000."

As stated, the plaintiff's pleaded grounds of ownership are based upon the transfer to and carrying of the account in defendant's name being without consideration, merely for con-

venience, and as a result of defendant's undue influence. Plaintiff had the burden of establishing the allegations by clear, convincing, and satisfactory proof. The trial court held the account was transferred into defendant's name as a matter of convenience without any intention of vesting any right or interest in the account in the defendant, and gave the securities on deposit to plaintiff. We have searched the long argument in plaintiff's brief for some argument seeking to uphold the trial court's holding that the account was transferred to defendant to serve the decedent's "convenience." We find no direct argument on the point. The transfer was made at a time when there was a deficiency judgment against decedent but plaintiff does not seem to argue the "convenience" here was similar to the "convenience" involved in the transfer of the Runnells farm. Plaintiff seems to argue that because decedent exercised almost exclusive dominion and control over the account, in the sense that he directed what securities to buy or sell and because the withdrawals were all turned over to decedent, the ownership of the account was actually his. The record is clear as to his dominion and control over the account but not so clear as to decedent's receiving all withdrawals, though they were deposited in his bank account on which defendant could not draw checks. As stated, all the Duro family income was deposited in this account during the years when the withdrawals were made. Moreover, certain other securities were purchased through this account which were placed in defendant's name and delivered to the defendant. But in any event, it is difficult to see how evidence that decedent exercised dominion over the account and took the profits supports a finding that the account was transferred to and carried in the name of defendant as a matter of convenience.

Plaintiff wholly failed to establish that the transfer was without consideration. She now admits there was some consideration, or at least defendant furnished a portion of the funds used to finance the account prior to the transfer, if she was the owner of the bonds and note account in the Great Western Coal Company. We have held she owned both the bonds and note account, and the proof here shows that she

furnished much more of the funds used to finance the account, both prior to and after the transfer on March 1, 1934.

We need not dwell on the charge of undue influence. Plaintiff admits decedent was the dominant character in the matter of dealing with this account and defendant was, as stated, an "errand girl." The charge of undue influence is inconsistent with the claim of "convenience." Plaintiff does not argue there was evidence of undue influence but is content with a brief statement that the burden was on defendant to negative undue influence and she failed to sustain her burden. From what we have stated before, the burden was not on defendant, but even if it were it is clearly shown decedent was not acting under anyone's influence. From all the evidence we would conclude there was some sort of joint arrangement whereby defendant was to furnish her funds to enable decedent to trade on margin with Polk-Peterson Corporation in a margin account in her name. What the arrangement was for the distribution of profits or the bearing of losses we do not know. We know that the trading was tremendously profitable and that most of the profits were turned over to decedent. The record would indicate that these profits financed decedent's other margin account with another brokerage concern, which he must have found convenient to carry in his own name, which was also tremendously profitable and which was turned over to the decedent's administratrix. It is our conclusion plaintiff failed to establish any trust, resulting or constructive, to the margin account in defendant's name and that the account and securities on deposit were the property of defendant.

XI. On October 4, 1926, the decedent and defendant rented a lockbox in the Bankers Trust Company. The record shows they signed a joint application to rent the box and that over the years, as revealed by the tickets signed by those who used the box, they both made continuous use of it. There was much other evidence firmly establishing that the lockbox was a joint box. At the time of decedent's death there were many stocks and bonds in this box. Plaintiff claimed in her petition that decedent was the owner of about $48,000 worth of securities in the box which defendant had appropriated to her own use

and refused to account therefor. She set forth a list of the securities, which are stocks and bonds in about seventeen companies, and alleged that while some of the securities were registered in the name of defendant the registration in defendant's name was without consideration, for convenience only, and was procured by fraud and undue influence of defendant.

There is no allegation in the petition that the stocks and bonds in the lockbox were purchased with decedent's funds but title was taken in defendant's name. The petition does not allege that the stocks and bonds that were registered in defendant's name were purchased on a consideration furnished by decedent. There is no allegation that the decedent ever transferred any of the stocks and bonds to defendant. It is difficult to see how plaintiff even pleaded a case of resulting trust as to these stocks and bonds. The rule as stated in 65 C. J., Trusts, section 972, is:

"Where a resulting trust is sought to be established and enforced, the * * * petition must allege with distinctness and precision all the essential facts from which the trust is claimed to result, such as the fact that the purchase money, or a portion thereof, of property the title to which was taken in the name of the defendant, was paid by plaintiff, or the person through whom he claims, including the amount or proportion of such payment."

As having some bearing thereon, see Hoon v. Hoon, supra, 126 Iowa 391, 393, 102 N. W. 105, where, in the case of a deed made to a child, we held the plaintiff had to plead more than that the parent's money furnished the consideration; that he must allege facts on which he relies to overcome the presumption of gift before he will be permitted to introduce evidence tending to show a trust and not a gift was intended. The sufficiency of the pleading was not challenged, but, even if deemed sufficient, the proof was insufficient to establish decedent's ownership by reason of a resulting trust. We cannot detail the evidence surrounding the purchase of these securities. It is enough to state that it shows that nearly all of the securities were registered in defendant's name; that in some instances they were paid for by check on decedent's bank account, some

by check on defendant's bank account, and some through the Polk-Peterson account in defendant's name. There was introduced in evidence what is known as Exhibit A-47, which is in the handwriting of decedent, and on the first page it is stated in decedent's handwriting: "E. Irene Duro, Inventory, December 1, 1940." Then follows a list of stocks and bonds. All of the securities here involved, with the possible exception of one worthless security, appear to be listed in decedent's handwriting in this inventory.

The trial court held all of the securities in the box which plaintiff claimed were the property of the defendant, with one exception which will be dealt with later. It held title was not obtained through fraud or undue influence and where registered in defendant's name the registration was not done as a matter of convenience and that the securities were purchased by or for defendant with her own funds. In this connection the trial court found that where the purchase price was in the form of a check from decedent's bank account in the Bankers Trust Company, the evidence showed the purchase was at a time when defendant's bank account was closed and much of her money was being deposited in decedent's account. We think the trial court's findings fully supported by the evidence.

With respect to one security in the box—$5,000 par value Interurban Railway Company bonds of the actual value of $325—the court held for plaintiff. The bonds, ten in number, are not registered. They are bearer bonds and defendant testified the decedent gave them to her in 1930 stating that at the time they had but little value but to hang onto them, for sometime they might be valuable. The court held the testimony was not admissible, under the objection that she was incompetent under the dead man statute, but there was certain other evidence that was clearly admissible that we feel establishes her ownership. She testified she put the bonds in the box, which was a joint box, and the decedent sets them out in his own handwriting, with the identical numbers, in the Exhibit A-47. Under the record there was a sufficient showing that the bonds were the property of defendant. She had the bonds in her possession and the decedent recognized her ownership in the same instru-

ment wherein he recognized defendant's ownership of stocks and bonds registered in defendant's name.

XII.  Certain other securities were, at the time of decedent's death, pledged as collateral security for the note of decedent and defendant to the Central National Bank & Trust Company. The note was for the accommodation of Polk-Peterson Corporation who, in a letter in evidence, agreed to pay defendant $500 for the loan of the collateral. The collateral securities involved are similar to the securities in the lockbox and, without more discussion, we conclude the trial court was right in holding the securities were the property of defendant.

XIII.  Two bank accounts are involved in this case: One, in the Iowa-Des Moines National Bank, was a joint account with the right of decedent and defendant to withdraw funds, and the right of property in the balance of the account, upon the death of one, placed in the survivor. The other account, in the Bankers Trust Company, was in the name of defendant but decedent had the right to draw checks on the account. Plaintiff claimed the balance in the two bank accounts at the time of decedent's death on the grounds that the accounts were opened with funds of the decedent; substantially all of the deposits in the accounts were decedent's funds; decedent did not intend to divest himself of ownership of the funds in the accounts; and dominion and control was always in decedent. The plaintiff further alleged the Bankers Trust Company account was carried in defendant's name for convenience only, without any consideration, and by virtue of defendant's undue influence, and that the Iowa-Des Moines National account was carried in both names as a mere convenience, and by virtue of defendant's undue influence, and decedent never intended to create a joint tenancy in the account.

The trial court confirmed defendant's ownership and property right in the balance in the Iowa-Des Moines National Bank account. We agree with this holding. The record shows this was a plain business account and that it was made up of their joint deposits. The card that each signed when the account was opened was about like the card in In re Estate of Winkler, 232 Iowa 930, 5 N. W. 2d 153.

■ The trial court held the Bankers Trust Company account was carried in defendant's name as a matter of convenience to enable the defendant to pay the general household and family expenses, and it ordered the balance at decedent's death, in the amount of $3,208.08, turned over to the plaintiff. This account was originally opened in 1925. There were numerous check exhibits. Decedent had the right to sign defendant's name to checks on this account. There is no record that he ever did. The account was balanced out about November 1, 1934, and it remained inactive until April 10, 1940. The account being in the name of the defendant, she was the prima facie owner thereof. The burden was on plaintiff to prove that this money was the decedent's. 9 C. J. S., Banks and Banking, section 285; Taliaferro v. Reirdon, 186 Okla. 607, 99 P. 2d 500. There was no sufficient evidence to rebut the presumption. Plaintiff argues in effect that it is to be inferred that all deposits in the account, especially in the early years, were decedent's funds if defendant was unable to testify as to the source of the deposits. It will be presumed all deposits in the account were of defendant's funds until plaintiff shows by competent evidence that they were deposits of decedent's funds. This account was balanced out and dormant for about six years. After it was reopened the record shows it was not used much for family expenses. Plaintiff concedes after it was reopened it was used to some extent for business purposes. The reopened account was in existence for approximately the last year decedent was alive, and during this period approximately $43,993.35 was deposited in the account. There was $3,208.08 in the account when decedent died. Approximately $1,500 was disbursed by defendant for family expenses and $40,785.27 was checked through the account in personal and business needs. Of the deposits in the account only three or four small deposits totaling less than $300 are actually traceable to any source other than the defendant's funds during this last year after the account was reopened. Plaintiff states in argument that "defendant's claim to ownership of virtually all of the funds deposited therein is dependent upon first proving her ownership to other properties." The answer is: defendant will be considered the owner of the account, made up, after it was reopened, of deposits of income

from other property in defendant's name, unless plaintiff shows by clear, convincing, and satisfactory evidence that the property in defendant's name was actually impressed with an implied trust in favor of decedent. Without further comment as to this account, we hold the plaintiff's evidence insufficient to rebut the presumption of ownership in the defendant.

XIV. Plaintiff claimed ownership of 500 shares of Michigan Public Service Company stock valued at $7,125. The record shows that on October 21, 1940, the stock was purchased through Polk-Peterson Corporation in the name of the defendant. The defendant gave a check on her bank account in the sum of $3,000 and decedent gave his check for $1,500. Defendant admits, and the record shows, that she was to have a one-half interest in the stock, Louise was to have a one-fourth interest, and one Mary Keturokis was to have a one-fourth interest in the stock. Decedent had some money from Mary Keturokis for investment. There seems to have been one more payment of $1,500 by someone, and after decedent's death defendant paid the balance in the sum of $1,125 by a check on her bank account in the Bankers Trust Company.

In pleading and in argument defendant admits the original purchase whereby the stock that would be in her name was really a purchase of a half interest. The controversy centers around who made the second $1,500 payment. The trial court held it would be assumed the payment was made from the margin account. It will be remembered the trial court held the margin account was decedent's. Consequently, the trial court held plaintiff, who had acquired Mary Keturokis's interest, was entitled to one half of the stock. The trial court's ruling was complicated by its earlier ruling that the bank account in defendant's name belonged to decedent. We reach the same result but by different reasoning. Here we have the trust agreement admitted in the pleading. Defendant's answer admits that the purchase of this stock "was made in the name of this defendant and for the benefit of this defendant, the plaintiff Louise D. Shaw, and Madeline Mary Keturokis—the interest of said parties being one half, one fourth and one fourth, respectively." She further pleads that she paid all but $1,500 of the purchase price of the

stock. Her proof establishes that she paid $4,125. She feels that she has no burden to show that she paid all "except the sum of $1,500." Defendant argues the burden was on plaintiff to show that she or decedent paid the second $1,500. When defendant admitted the original agreement, wherein she would be the beneficial owner of a one-half interest in the stock purchased, she had the burden of showing her interest was greater by reason of her payment of more than one half of the purchase price. At the time of decedent's death $6,000 had been paid on the purchase price of the stock. She testifies she had paid $3,000 and that decedent had paid $1,500. She does not testify she paid the other $1,500. After decedent's death she paid the balance, or $1,125.

The arrangement seems to have been that decedent was to pay one half from his own funds, or funds belonging to Louise and to Mary Keturokis that he had for investment. In the absence of proof to the contrary we will assume he paid one half of the amount that was paid at the time he died. His estate will be held liable for one half the balance of the purchase price unpaid at the time of his death. Consequently, upon the plaintiff, as administratrix, paying $562.50 to defendant, with proper adjustment as to credit for dividends, if any, 250 shares of Michigan Public Service Stock are to be transferred by defendant to plaintiff. No credit for interest is to be allowed defendant for payments upon the purchase price of the stock.

XV. The plaintiff contended a Lincoln Zephyr automobile, registered in defendant's name, belonged to decedent; that the car was purchased with decedent's money; that it was registered in defendant's name as a matter of convenience only and by virtue of the undue influence of the defendant. The trial court confirmed defendant's ownership of the car, holding there was no fraud or undue influence; the registration in defendant's name was not for convenience, and that all of the elements of a gift were present.

We think the trial court was right. The plaintiff does not argue the charge of undue influence or the claim of convenience. Her argument is that decedent's money and property paid for the car and it is therefore the property of his estate; that de-

fendant failed to sustain her burden of proof as to a gift. In her first answer defendant alleged the automobile was purchased by the decedent and given to her. By an amended and substituted answer she alleged it was purchased by herself and decedent. The evidence tended to establish that the car was either given to defendant by decedent or that the purchase price was paid by both. The car was purchased in March of 1939 and registered in defendant's name. It was still registered in defendant's name in 1940 and succeeding years. Another car owned by decedent was the trade-in and decedent's check for the balance on his Bankers Trust account paid the balance of the purchase price. This was while defendant's bank account was inactive and defendant's funds were being deposited in decedent's bank account. The decedent paid one license fee, while defendant's account was closed, and after that defendant paid the license fee. Certain work sheets for defendant's income tax in decedent's handwriting deducted the license fees from her income. The decedent at various times acknowledged to several other persons that the car belonged to defendant. Defendant used the car and paid for insurance and repairs. Without deciding the question of burden of proof we hold that, whether a gift or whether partially purchased with her own funds, the defendant's ownership of the car was established. The case of Charles v. Hart, 191 Iowa 418, 182 N. W. 668, is not in point. There it does not appear that the car was registered in any name but the decedent's and he left a memorandum indicating he owned the car.

XVI. The trial court held certain diamonds, found in the deposit box following decedent's death, were the property of the defendant. We are not disposed to disturb its ruling. There was evidence that decedent gave the diamonds to defendant; that she was seen wearing some of them, and a rather persuasive deposition of a Mrs. Buchanan of an incident when decedent asked defendant to show Mrs. Buchanan her diamonds and talked of the diamonds here involved as being defendant's property. The plaintiff does not plead there was any fraud or undue influence exercised by defendant.

This completes the list of property. We have not touched

**414**

upon the defenses of the statute of limitations, laches, or estoppel. There was some dispute between the parties as to whether these defenses were timely pleaded. The trial court seems to have resolved the dispute in defendant's favor but we do not pass on that question, and we do not pass on whether, if properly pleaded, the defenses would bar plaintiff's action as to some of the property involved.

Except as to the Michigan Public Service Stock, where the decree will be as indicated herein, the cause is reversed on defendant's appeal and remanded for decree dismissing plaintiff's petition as to all other property.—Reversed and remanded on defendant's appeal; affirmed on plaintiff's appeal. Costs taxed to plaintiff.

OLIVER, C. J., and BLISS, HALE, MANTZ, SMITH, and HAYS, JJ., concur.

GARFIELD, J., takes no part.